**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 20-cv-03119-NYW-KLM
*Consolidated with Civil Action No. 21-cv-00104*

WESLEY NELSON, by and through his conservator and guardian, AMY NELSON,

     Plaintiff,

v.

TOYOTA MOTOR CORPORATION, and
TOYOTA MOTOR SALES, U.S.A. INC.,

     Defendants.

---

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Pending before the Court is Plaintiff Wesley Nelson ("Plaintiff" or "Mr. Wesley Nelson"), by and through his conservator and guardian, Amy Nelson's Motion for Partial Summary Judgment (the "Motion" or "Motion for Partial Summary Judgment"). [Doc. 94, filed April 28, 2022]. Defendants filed a Response opposing the motion (the "Response"). [Doc. 97, filed May 19, 2022]. Plaintiff filed a Reply. [Doc. 107, filed June 9, 2022]. The Court finds that oral argument would not materially assist in the resolution of the issues presented in the Motion. For the reasons set forth below, the Court **GRANTS in part and DENIES in part** the Motion.

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are drawn from the record in this case and are undisputed for the purposes of resolving the instant Motion, unless otherwise noted.

This action stems from a motor vehicle accident that occurred on October 25, 2018 in Adams County, Colorado. [Doc. 94 at ¶¶ 1–2; Doc. 97 at ¶¶ 1–2]. Plaintiff was the front-seat

passenger in a 2017 Toyota RAV4 (the "vehicle" or the "RAV4") that was driven by his grandfather, Mr. Dennis Bender ("Mr. Bender"), and his grandmother, Ms. Cecile Bender ("Ms. Bender"). [Doc. 94 at ¶ 3; Doc. 97 at ¶ 3]. While moving eastbound on East 168th Avenue, Mr. Bender lost control of the vehicle. [Doc. 94 at ¶ 4; Doc. 97 at ¶ 4]. The vehicle swerved into the westbound lane, returned to the eastbound lane, and then continued south off the roadway. [*Id.*]. The vehicle collided with a utility pole, and rolled over three times before coming to rest on the driver's side. [*Id.*]. It is undisputed that "the front airbags, side-curtain airbags, and seatbelt pretensioners did not deploy" during the crash. [Doc. 94 at ¶ 5; Doc. 97 at ¶ 5]. Ms. Bender was ejected from the vehicle during the crash and died at the scene. [Doc. 94 at ¶ 6; Doc. 97 at ¶ 6]. She was not wearing her seatbelt at the time of the crash. [Doc. 97 at ¶ 59; Doc. 107 at ¶ 59]. Plaintiff sustained injuries in the crash as well, though the Parties dispute the extent of those injuries relative to his pre-crash condition. [Doc. 94 at ¶ 6; Doc. 97 at ¶ 6].

On October 16, 2020, Plaintiff initiated this action against Defendants Toyota Motor Company and Toyota Motor Sales, U.S.A., Inc. (collectively, "Defendants" or "Toyota"), asserting product liability claims under strict liability (Count I) and negligence (Count II). [Doc. 1]. He then amended his pleading four days later, but maintained the same causes of action. *See* [Doc. 4]. On October 23, 2020, Amy Nelson ("Ms. Nelson"), as surviving heir and daughter of Ms. Bender, filed a second case against Defendants in the District Court of Adams County, Colorado. (ECF No. 4.)[1] On January 13, 2021, Defendants removed that case to this Court, Civil Action No. 21-cv-104-WJM-KLM. (ECF No. 1.) The second case arose from the same motor vehicle accident and also alleged product liability claims based on strict liability and

---

[1] The Court uses the convention [Doc. ____] to refer to filings on the Electronic Case Filing ("ECF") docket in this action. When referring to documents originally filed in Civil Action No. 21-cv-104-WJM-KLM, this Court uses (ECF No. ____) to distinguish between the dockets.

negligence. *See* [Doc. 39].  The actions were consolidated on April 20, 2021.  [*Id.*].  On October 4, 2021, the Court accepted for filing the Second Amended Complaint, which continued to allege product liability claims based on strict liability and negligence.  [Doc. 60; Doc. 61].

Relevant here, on March 16, 2021, Defendants filed a Designation of Nonparties at Fault, identifying Ms. Nelson; Bradley Nelson ("Mr. Brad Nelson"), Plaintiff's father; and Ms. Bender. [Doc. 37].[2]  Plaintiff moved for partial summary judgment to strike such Designation, which was mooted by the Court upon the filing of the operative Third Amended Complaint that asserts one claim for product liability based only on strict liability.  [Doc. 80; Doc. 81].  Defendants then filed a Designation of Non-Parties at Fault on January 31, 2022 ("Designation"), again identifying Mr. Bender; Ms. Nelson; Mr. Brad Nelson; and Ms. Bender.  [Doc. 85].  Plaintiff filed the instant Motion for Partial Summary Judgment, renewing his request to strike Ms. Nelson, Mr. Brad Nelson, and Ms. Bender as nonparties at fault.  [Doc. 94].  Defendants opposed, [Doc. 97], and Plaintiffs filed a Reply, [Doc. 107].  Thus, this Motion is ripe for consideration.

## LEGAL STANDARD

As an initial matter, the Court notes that the Parties dispute whether the underlying Motion is properly construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, or if it should be construed as a motion to strike under Rule 12(f). *Compare* [Doc. 94 at 6–7] *with* [Doc. 97 at 16–18].  There is a division of authority on this question.  Defendants argue that this Motion should be analyzed under Rule 12(f), reasoning that Plaintiff is moving "to strike the nonparty designations of three individuals and eliminate [their]

---

[2] Defendants previously identified Mr. Bender as a nonparty at fault in a separate filing.  [Doc. 21].  Plaintiff has not challenged, and does not challenge, the designation of Mr. Bender as a nonparty at fault.  *See* [Doc. 94].

ability to argue certain affirmative defenses like the degree of fault of these nonparties."  [Doc. 97 at 15–16].  Plaintiff, on the other hand, argues that he is not moving to strike any defense; rather, he requests "the Court to determine whether any of the non-parties designated by the defendants owed the Plaintiff a duty of care as a matter of law," and that the Motion should accordingly be analyzed under a summary judgment standard.  [Doc. 107 at 10].

Some courts in this District have noted that the "[d]esignation of a non-party at fault is a pleading in the nature of an affirmative defense in that it pleads matters extraneous to [a] plaintiff's prima facie case and attempts to deny, in part, [a] plaintiff's right to recover regardless of the truth of the facts alleged in the complaint."  *Resolution Trust Corp. v. Ascher*, 839 F. Supp. 764, 766 (D. Colo. 1993) (citing *Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980)).  For that reason, those courts have decided those motions "based on the same standard of review for motions to strike affirmative defenses."  *Id.*   Under that standard, a "contested non-party designation will be stricken as insufficient pursuant to Fed. R. Civ. P. 12(f) if, as a matter of law, the defense cannot succeed under any circumstance."  *Id.* (citing *Fed. Deposit Ins. Corp. v. Isham*, 782 F. Supp. 524, 530 (D. Colo. 1992)).

Other courts in Colorado and this District have analyzed similar motions under the standards for summary judgment prescribed by Federal Rule of Civil Procedure 56.  *See, e.g.*, *Phillips v. Miser*, No. 19-cv-3332-WJM-SKC, 2021 WL 4914395, at *1 (D. Colo. Aug. 12, 2021); *Manula v. Kelley Trucking, Inc.*, No. 2007 CV 228, 2010 WL 8933226 (Colo. Dist. Ct. Jan. 13, 2010) (denying summary judgment as to a designated nonparty at fault).  This Court has similarly noted the potential that such motions could be analyzed at summary judgment, though without expressly passing on the procedural issue that is extant in this case.  *McGraw v. Cobra Trucking Inc.*, No. 20-cv-01032-NYW, 2020 WL 7230637, at *5 (D. Colo. Dec. 8, 2020).  Still

other cases analyze similar motions as those to strike a designation but, in the alternative, for partial summary judgment. *See Larrieu v. Best Buy Stores, L.P.*, No. 10-cv-01883-CMA-BNB, 2013 WL 4838912, at *1–4 (D. Colo. Sept. 9, 2013). A motion for partial summary judgment is reviewed using the same standard as a motion for summary judgment. *See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The Court may grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put differently, the Court's function at summary judgment "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has not squarely addressed whether motions challenging the designations of a nonparty at fault under a state statute should be raised as motions to strike or as motions for summary judgment. *See Jones v. Krautheim*, 208 F. Supp. 2d 1173, 1174 (D. Colo. 2002) (observing that "[o]rdinarily, federal courts sitting in diversity cases apply federal procedural law and state substantive law" (first citing *Hanna v. Plumer*, 380 U.S. 460 (1965); and then *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996))). Here, Plaintiff does not challenge the sufficiency of the pleading, *e.g.*, whether the nonparties have been sufficiently identified. *See* [Doc. 94]; *cf. Pedge v. RM Holdings, Inc.,* 75 P.3d 1126, 1128 (Colo. App. 2002) (noting that "[b]efore the finder of fact may consider the negligence or fault of a nonparty, the issue must be properly raised by a defendant"). Rather, he challenges whether these individuals can be designated as nonparties at fault as a matter of law and whether Defendants have adduced sufficient evidence to present to a

jury to allow it to find the nonparties negligent.  *See* [Doc. 94].  In addition, significant discovery has been taken, discovery is presumably closed, [Doc. 90], and the Parties were proceeding to trial.  It is clear that Tenth Circuit law permits a plaintiff to move for summary judgment on an affirmative defense.  *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) ("A defendant may use a motion for summary judgment to test an affirmative defense which entitles that party to a judgment as a matter of law.").  And Colorado courts have observed that "where a defendant designates a nonparty at fault and presents no evidence of liability, the court should not submit that claim to the jury."  *Barton v. Adams Rental, Inc.*, 938 P.2d 532, 536 (Colo. 1997).  In these specific circumstances, this Court finds that the appropriate framework is one for partial summary judgment as to the affirmative defense of a nonparty's fault.  Thus, this Court will apply such standard to its analysis herein, i.e., Defendants must provide credible evidence establishing each essential element of the defense.[3]  *Cf. Est. of Grubbs v. Weld Cnty. Sheriff's Off.*, No. 16-cv-00714-PAB-STV, 2018 WL 3145629, at *15 (D. Colo. June 26, 2018) (considering judgment as a matter of law with respect to an officer who had been designated a nonparty at fault for a detainee's suicide).

## ANALYSIS

### I.   Designation of Nonparty at Fault

"As part of the tort reform movement in Colorado, the General Assembly eliminated joint and several liability wherein one tortfeasor might be liable in damages for the acts of another tortfeasor, and adopted a several liability scheme, wherein a tortfeasor is responsible only for the

---

[3] This Court is not persuaded that Defendants' cited authority mandates otherwise.  For instance, *Sender v. Mann*, 423 F. Supp. 2d 1155 (D. Colo. 2006), did not involve the designation of nonparties at fault.  In addition, the plaintiff in *Sender* did not seek to deny defendants the right to assert certain affirmative defenses, but only to reduce confusion in the pleadings.  *Id.* at 1163.  Thus, the dissimilarities between the two cases limits the applicability of the *Sender* case to this one.

portion of the damages that he or she caused."  *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 284

(Colo. 2000). [4]  Under Colorado Revised Statute § 13-21-111.5(1),

> [i]n an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss[.]

In this type of case, Colorado law dictates that liability be attributed on the basis of a "degree or

percentage of the negligence or fault."  *Id.*  Section 13-21-111.5 provides, in relevant portion:

> (3)(a) Any provision of the law to the contrary notwithstanding, the finder of fact in a civil action may consider the degree or percentage of negligence or fault of a person not a party to the action, based upon evidence thereof, which shall be admissible, in determining the degree or percentage of negligence or fault of those persons who are parties to such action. . . .

> (b) Negligence or fault of a nonparty may be considered if the claimant entered into a settlement agreement with the nonparty or if the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action unless the court determines that a longer period is necessary. The notice shall be given by filing a pleading in the action designating such nonparty and setting forth such nonparty's name and last-known address, or the best identification of such nonparty which is possible under the circumstances, together with a brief statement of the basis for believing such nonparty to be at fault.

Colo. Rev. Stat. § 13-21-111.5(3)(a)–(b).  One purpose of the designation is to allow a defendant

to attempt to reduce its liability where others may have also contributed to the plaintiff's injury.

*See Pledge v. RM Holdings, Inc.*, 75 P.3d 1126, 1128 (Colo. App. 2002) ("This designation

ensures that parties found liable will not be responsible for more than their fair share of the

damages.").   But the Colorado Supreme Court has instructed that "[c]ourts should construe

designation requirements strictly to avoid a defendant attributing liability to a non-party from

---

[4] Colorado substantive law applies, as this case concerns a single claim raised under Colorado state law, and is premised upon diversity jurisdiction conferred by 28 U.S.C. § 1332(a)(1)–(2). *See* [Doc. 80 at ¶¶ 6, 41–47]; *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Hanna*, 380 U.S. at 465 (noting that the *Erie* doctrine has been interpreted to mean that federal courts are to apply state substantive law, but federal procedural law).

whom the plaintiff cannot recover." *Redden v. SCI Colo. Funeral Servs., Inc.,* 38 P.3d 75, 80 (Colo. 2001) (en banc), *as modified on denial of reh'g* (Jan. 14, 2002).  It is not enough for a nonparty to be a cause of the alleged injury.  *See id.*  ("The first question before us in this petition, then, is whether a simple statement supporting only 'causation' satisfies a statutory requirement of an allegation of 'fault or negligence.' We hold that it does not.").

Instead, the party designating a nonparty at fault must be able to demonstrate that the nonparty at fault is either negligent or at fault *legally*:

> In well-settled tort jurisprudence, a claimant alleging negligence of another party must establish the existence of a duty, a breach of that duty, causation, and damages. Fault is broader than negligence, including, for example, intentional torts, but it likewise implies legal responsibility for the purposes of the designation statute.

*Redden*, 38 P.3d at 80 (citation omitted).

## II.   Defendants' Designation

Defendants designated each individual as nonparty at fault for separate reasons, as follows:

> *Ms. Amy Nelson* is Plaintiff's mother, conservator, and guardian. Ms. Nelson was on the phone with Plaintiff during the Incident and might have directed Plaintiff to intervene by, for instance, turning off the vehicle, redirecting the wheel, or placing the vehicle into park. In addition, Ms. Nelson might have directed Mr. Bender to drive, encouraged Mr. Bender to drive, failed to intervene in Mr. Bender driving, or permitted Mr. Bender to drive despite knowledge of Mr. Bender's history of diabetes and incapacitating diabetic incidents; this placed Plaintiff in a foreseeable and unreasonable risk of harm.

> *Ms. Cecile Bender* is Plaintiff's late grandmother and was in the vehicle when the Incident occurred. Ms. Bender might have contributed to the crash and Plaintiff's injuries by intervening in the Incident by, for instance, turning off the vehicle, redirecting the wheel, placing the vehicle into park, or attempting to inject Mr. Bender with insulin. She also might have directed or encouraged Plaintiff to intervene in a similar way. Ms. Bender also might have contributed to Plaintiff's injuries by failing to wear a seatbelt and being unrestrained during the crash.

> Further, Ms. Bender might have directed Mr. Bender to drive, encouraged Mr.

Bender to drive, failed to intervene in Mr. Bender driving, or permitted Mr. Bender to drive despite knowledge of Mr. Bender's history of diabetes and incapacitating diabetic incidents. This placed Plaintiff in a foreseeable and unreasonable risk of harm.

*Mr. Bradley Nelson* is Plaintiff's father. Mr. [Brad] Nelson might have directed Mr. Bender to drive, encouraged Mr. Bender to drive, failed to intervene in Mr. Bender driving, or permitted Mr. Bender to drive despite knowledge of Mr. Bender's history of diabetes and incapacitating diabetic incidents. This placed Plaintiff in a foreseeable and unreasonable risk of harm.

[Doc. 85 at 5–7 (emphasis added)].

In reviewing Defendants' Designation and their Response to the instant Motion, there is no identification of an intentional tort committed by Ms. Bender, Ms. Nelson, or Mr. Brad Nelson against Mr. Wesley Nelson.  *See* [Doc. 85; Doc. 97];  *Restatement (Second) of Torts* § 8A cmt. a–b (1965) (defining "[i]ntent, as it is used throughout the Restatement of Torts," as having "reference to the consequences of an act rather than the act itself" with the following illustration: "On a curve in a narrow highway A, without any desire to injure B, or belief that he is substantially certain to do so, recklessly drives his automobile in an attempt to pass B's car.  As a result of this recklessness, A crashes into B's car, injuring B.  A is subject to liability to B for his reckless conduct, but is not liable to B for any intentional tort.").  Therefore, this Court limits its consideration to whether it can decide, as a matter of law based on the record before it, that Ms. Bender, Ms. Nelson, and Mr. Brad Nelson could not be negligent.

## III.  Analysis

"Under Colorado law, to recover for the negligent conduct of another, a plaintiff must establish: 1) the existence of a legal duty owed to the plaintiff by the defendant; 2) breach of that duty; 3) injury to the plaintiff; and 4) actual and proximate causation." *Ireland v. Jefferson Cnty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1227–28 (D. Colo. 2002) (citing *Leake v. Cain*, 720 P.2d 152, 155 (Colo. 1986)).  In the Motion for Partial Summary Judgment, Plaintiff contends that

none of these individuals are appropriate nonparties at fault because none of them owed Mr. Wesley Nelson, as an independent adult, a duty of care. *See generally* [Doc. 94]. Defendants' arguments in response are manifold, but they contend, *inter alia*, that both Mr. Brad Nelson and Ms. Nelson had a special relationship with Mr. Wesley Nelson due to his mental health condition;[5] that no special relationship was required to permit a finding of duty even in the context of nonfeasance; that Ms. Nelson's and/or Ms. Bender's affirmative actions breached a duty of care even absent a special relationship; and Ms. Nelson, Mr. Brad Nelson, and that Ms. Bender breached a duty by failing to prevent Mr. Bender from driving Plaintiff. *See* [Doc. 97]. On Reply, Plaintiff argues that much of Defendants' adduced facts—though apparently undisputed—are immaterial, and that Ms. Bender did not owe any duty of care to Mr. Wesley Nelson. [Doc. 107]. This Court begins its analysis with Mr. Brad Nelson, as it is the simplest.

### A.  Mr. Brad Nelson

#### 1.  Duty to Prevent Mr. Bender From Driving

Though not argued in the pending Motion, the Court first considers whether Mr. Brad Nelson can be liable for negligence based on his failure to prevent Mr. Bender from driving, as argued by Defendants. *See* [Doc. 97 at 31]. In support of this theory, Defendants rely on Mr. Brad Nelson's completion of a medical history form after the accident to demonstrate that he was familiar with Mr. Bender's diabetic history. [*Id.*].

"[T]he person or entity designated under § 13–21–111.5 must, in order for his or her fault or negligence to be measured under the statute, owe or have owed a duty recognized by the law to the injured plaintiff." *Miller v. Byrne*, 916 P.2d 566, 578 (Colo. App. 1995). Generally, a person does not have a duty to prevent a third person from harming another unless a special

---

[5] Defendants do not contend that either Mr. Bender or Ms. Bender had a special relationship with Mr. Wesley Nelson. *See generally* [Doc. 97].

relationship exists between the defendant and the wrongdoer or between the defendant and the victim. *See Ireland*, 193 F. Supp. 2d at 1228; *Lego v. Schmidt*, 805 P.2d 1119, 1122 (Colo. App. 1990) (observing that "a duty to control the conduct of a third person to prevent him from causing physical harm to another only if a special relation exists between the actor and either the wrongdoer or the victim").

Relying upon *Lopez v. Trujillo*, 399 P.3d 750, 753 (Colo. App. 2016), Defendants argue that a "special relationship" is just one of the factors that the Court should consider as to whether there is a duty flowing from Ms. Nelson to her son that was violated by her actions. *See* [Doc. 97 at 21–22]. In doing so, they ignore the Colorado Supreme Court's determination *on appeal from that very case*. On appeal, the Colorado Supreme Court clearly articulated that when the theory of negligence is based on the failure to act, i.e., nonfeasance, "the existence of a duty has been recognized only during the last century in situations involving a limited group of special relationships between parties." *N.M. by & through Lopez v. Trujillo*, 397 P.3d 370, 374 (Colo. 2017) (citing *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987)); *see also Fine v. Tumpkin,* 330 F. Supp. 3d 1246, 1253 (D. Colo. 2018) (observing that under Colorado law, nonfeasance cases require the party asserting negligence to establish "that a special relationship exists between the parties such that social policy justifies the imposition of a duty to act" (quoting *Montoya v. Connolly's Towing, Inc.*, 216 P.3d 98, 104 (Colo. App. 2008)). Indeed, the *N.M.* court explained that "we have generally declined to impose a duty of care in cases involving a defendant's nonfeasance, absent a special relationship between the parties." *N.M.*, 397 P.3d at 374. This Court finds no authority or basis to deviate from this well-settled law.

*Special Relationship.* Here, Defendants make no specific argument that there is a special relationship between Mr. Brad Nelson and Mr. Bender, who were two independent adults.

Defendants present no evidence that Mr. Brad Nelson was responsible for or even active in any management of Mr. Bender's diabetes before the collision. *See generally* [Doc. 97]. Rather, they merely point to Mr. Bender's role in filling out a post-incident medical form to establish Mr. Brad Nelson's "familiar[ity]" with Mr. Bender's medical conditions. [*Id.* at 30]. There is insufficient evidence to infer the level of control necessary to create a special relationship between Mr. Brad Nelson and Mr. Bender. *Cf. Davenport v. Cmty. Corr. of Pikes Peak Region, Inc.*, 962 P.2d 963, 968 (Colo. 1998) ("Whether a special relationship exists between [the nonparty] and [the tortfeasor driver] depends, in large part, upon the level of control exercised by [the nonparty] over [the driver].", *as modified on denial of reh'g* (July 27, 1998).

Even assuming a special relationship that exists (which the Court finds, does not), there would not be a resulting duty to prevent Mr. Bender from driving by looking at other relevant factors.[6]  *See Solano v. Goff*, 985 P.2d 53, 54 (Colo. App. 1999) ("In determining whether a defendant owes a legal duty to prevent a third person from harming another, the following factors are generally considered: (1) the existence of a special relationship between the parties; (2) the foreseeability of harm to others; (3) the social utility of the defendant's conduct; (4) the magnitude of the burden of guarding against injury or harm; and (5) the practical consequences of placing a duty upon the defendant."). A touchstone for the duty to exercise reasonable care is foreseeability; any such duty can only extend only to reasonably foreseeable damages and injuries to reasonably foreseeable plaintiffs. *See Leppke v. Segura*, 632 P.2d 1057, 1059 (Colo.

---

[6] Even in cases where a special relationship exists, the Colorado Supreme Court has looked to additional factors to determine the existence and contours of such duty. *See Westin Operator, LLC v. Groh*, 347 P.3d 606, 613–14 (Colo. 2015) ("To determine whether a defendant owes a plaintiff a duty to act to avoid injury, we assess: (1) the risk involved in the defendant's conduct; (2) the foreseeability5 and likelihood of injury weighed against the social utility of the defendant's conduct; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant.").

App. 1981). In addition, the duty owed must be measured by the foreseeability of the specific risk and whether the danger created is sufficiently large to embrace the specific harm. *See Brady v. Hopper*, 570 F. Supp. 1333, 1338 (D. Colo. 1983), *aff'd*, 751 F.2d 329 (10th Cir. 1984).

There is no evidence that Mr. Brad Nelson observed Mr. Bender in an impaired state on the date of the collision, or that he was even aware that Mr. Bender was driving Plaintiff prior to the accident. *See* [Doc. 85 at 6]. Nor is there any evidence that Mr. Bender had previously had any type of difficulty driving due to his diabetes. *See generally* [Doc. 97]. Though the Designation posits that "Mr. [Brad] Nelson might have directed" or "encourage Mr. Bender to drive," [Doc. 85 at 6], Defendants have identified no such evidence in the record before the Court. Defendants cannot rely upon unsubstantiated allegations or mere speculation, conjecture, or surmise to avoid summary judgment proceedings; rather, they must supply admissible evidence. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Based on the record before the Court, even weighing other factors "including the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm caused to the plaintiff, the practical consequences of placing such a burden on the defendant, and any additional elements disclosed by the particular circumstances of the case," *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320 (Colo. 1992), this Court finds no basis to extend the limited types of special relationships defined by the Colorado courts in the last century to include the relationship between Mr. Brad Nelson and Mr. Bender based on the circumstances presented herein. In turn, this Court concludes that Mr. Brad Nelson had no duty to prevent Mr. Bender from driving Mr. Wesley Nelson (or anyone else) on the date of the collision.[7]

---

[7] Here, the Court cannot overlook the practical implications and social burdens of imposing a duty upon Mr. Nelson to essentially monitor the medical condition and driving abilities of his father-in-law—another adult with whom he has no legal custodial relationship and over which he

## 2.    Duty to Prevent Mr. Wesley Nelson from Riding with Mr. Bender

Next, the Court considers Defendants' theory that Mr. Brad Nelson can be liable for negligence because he owed a duty of care to Mr. Wesley Nelson based on their special relationship or other factors to prevent him from riding with Mr. Bender.

***Special Relationship.*** "Special relationships are predicated on some definite relation between the parties of such a character that social policy justifies the imposition of a duty to act." *Ireland*, 193 F. Supp. 2d at 1228 (quotation omitted). It is clear that a parent has a special relationship with a minor child. *See Doering ex rel. Barrett v. Copper Mountain, Inc.*, 259 F.3d 1202, 1216 (10th Cir. 2001); *Paris ex rel. Paris v. Dance*, 194 P.3d 404, 408 (Colo. App. 2008) (holding that a parent could be designated as a nonparty at fault for a dog bite suffered by a minor based on alleged failure to supervise), *superseded by statute on other grounds,* Ch. 168, sec. 1, § 13-21-124, 2004 Colo. Sess. Laws 507–08.

It is, however, not established that a parent has a special relationship with a legally emancipated adult child,[8] even if the adult child is "incapable of supporting himself because of his disabilities." [Doc. 97 at 27]. Defendants cite no authority for the proposition, or the proposition that the very nature of the relationship between Mr. Brad Nelson and his son gives rise to a duty owed by Mr. Brad Nelson to Plaintiff that includes preventing him from riding with Mr. Bender. *See* [*id.*]. Because it appears that the Colorado Supreme Court has not passed on the issue of whether a parent has a "special relationship" with an emancipated adult child who

---

has no legal control. *Cf. Sego v. Mains,* 578 P.2d 1069, 1072 (Colo. App. 1978) (holding a son who acted as the custodian of his mentally ill mother could not be liable for her tort under a negligence per se theory, because "in the absence of proof that a mentally ill person is dangerous to others, the custodian will not be held as a guarantor of the public safety. To hold otherwise would be to treat the custodian unfairly." (citations omitted)).

[8] Defendants do not dispute that at the time of the collision, Mr. Wesley Nelson was legally emancipated from his parents. *See generally* [Doc. 97].

may be mentally and/or physically impaired in some manner, this Court must attempt to determine how the Colorado Supreme Court would rule. *See Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901–02 (10th Cir. 2005). In doing so, this Court is "free to consider all resources available, including decisions of [Colorado] courts, . . . in addition to the general weight and trend of authority." *FDIC v. Schuchmann,* 235 F.3d 1217, 1225 (10th Cir. 2000).

"One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to [aid or protect] the other." *Restatement (Second) of Torts* § 314A(4) (1965). Section 320 of the Restatement (Second) further provides:

> One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor
>
> (a) knows or has reason to know that he has the ability to control the conduct of the third persons, and
>
> (b) knows or should know of the necessity and opportunity for exercising such control.

*Id.* at § 320.

"Central to there being a special relation between actor and wrongdoer is a determination that the actor has the *right and capacity* to control the wrongdoer." *Lego*, 805 P.2d at 1122 (emphasis added). Here, there is no evidence in the record to suggest that at the time of the accident, Mr. Brad Nelson was required to take or had legal custody of Mr. Wesley Nelson. *See generally* [Doc. 97]. Nor evidence that Plaintiff had been deemed legally incompetent, or legally incapacitated. [*Id.*]. It is also undisputed that Mr. Brad Nelson was not a legal guardian or conservator for Mr. Wesley Nelson at that time; it is undisputed that the guardianship of Mr.

Wesley Nelson by his parents was not established until April 2019—six months after the collision. *See* [Doc. 94-5]. Nor is there evidence that Mr. Brad Nelson had a legal right to control his son through any other means, or that Mr. Wesley Nelson was incapable of effectively exercising self-protective care such as refusing to ride with his grandfather on the date of the collision.

Whether or not Mr. Brad Nelson is listed as an emergency contact for his son does not speak to his ability to legally control Mr. Wesley Nelson. *See* [Doc. 97 at ¶ 33]. Similarly, whether or not Mr. Wesley Nelson could financially support himself at the time of the collision, and the case law associated with financial support, are inapposite because the issue is not one of financial support, but one of preventing bodily harm to Plaintiff. Even drawing all inferences regarding Mr. Wesley Nelson's struggles with mental health issues and independent living skills in favor of Defendants, *see* [*id.* at ¶¶ 31–49], there is not a genuine issue of material fact that Mr. Brad Nelson had a legal right to control his son's actions, or stood in the way of his son being able to make decisions about his own care, at the time of the collision. Indeed, like the Connecticut Supreme Court observed, neither this Court's research—nor the authority provided by Defendants—"has disclosed any case in which a parent, merely by making a home for an adult child who is a mental patient, has been held to be '[o]ne who takes charge of a third person[.]'" *Kaminski v. Town of Fairfield*, 578 A.2d 1048, 1052 (Conn. 1990).

This Court's focus on whether Mr. Brad Nelson had legal control over his son at the time of the accident is not a matter of semantics, but rather, one that is supported by analogous case law and public policy. When considering whether a parent has a special relationship with an adult child with mental health and/or disability issues to justify a negligence action brought by a third party injured by that child, state courts have recognized that generally, subject to limited

exceptions, "no such duty exists between parents and their emancipated adult children." *See Adams v. Aircraft Spruce & Specialty Co.*, 283 A.3d 42, 50 n.9 (Conn. App. 2022) (citing Kimberly C. Simmons, Annotation, *Liability of Adult Assailant's Family to Third Party for Physical Assault* [hereinafter "*Liability for Adult Assailant*"], 25 A.L.R. 5th 1, § 2[b] (1994) ("Courts . . . rarely find justification for imposing liability on parents for the conduct of their adult, emancipated children and hold that where there is no legal right to control the children, there can be no liability imposed on the parent.")).  "Most courts hold that members of an assailant's family do not have a duty either to warn third persons of potential danger posed by the assailant or to control the actions of the assailant in relation to third persons."  Simmons, *Liability for Adult Assailant*, 25 A.L.R. 5th 1.  In addition, state courts have also found that a parent's role in an adult child's mental health care does not create a duty to supervise the child. *See, e.g.*, *Koenig v. London*, 968 N.W.2d 646, 659 (S.D. 2021).  Indeed, Defendants identify, and this Court's independent research generated, no authority from any state or federal court that found a special relationship between a parent and a legally emancipated adult child.  *See generally* [Doc. 97].

Public policy supports the conclusion that as a general matter, a parent of a legally emancipated adult child does not have a special relationship giving rise to a duty to protect that emancipated adult child from harm, even with knowledge of that adult child's mental health or functional limitations and even when that emancipated adult child lives with his parent.  First, potential liability to a parent for failing to protect an adult child for whom she does not have legal control would be incongruous, because she does not have the legal right to prevent the adult child from taking any action.  Second, imposing a duty upon a parent for a legally emancipated child based on material or emotional support for known limitations discourages, rather than

encourages, the social good from such support.  Third, the presumption of a special relationship undercuts the autonomy of an emancipated adult child and introduces an inference of parental control that is not supported by law (and may not be supported in fact).

Even if a special relationship existed here, Defendants fail to present sufficient evidence to suggest that the risk presented by Mr. Bender to Mr. Wesley Nelson was reasonably foreseeable to Mr. Brad Nelson, or that any of the other factors weigh in favor of the finding of a duty owed by Mr. Brad Nelson to his son.  *See generally* [Doc. 97].  Further, there are no allegations of affirmative conduct, i.e., misfeasance, on the part of Mr. Brad Nelson. *See generally* [*id.*].  Accordingly, this Court concludes that no such duty existed as a matter of law, and **GRANTS** summary judgment in favor of Plaintiff as to the issue of Defendants' designation of Bradley Nelson as a nonparty at fault.

### B.     Amy Nelson

#### 1.     Duty to Prevent Mr. Bender From Driving

***Special Relationship.***   Courts outside of Colorado have noted that "the natural relationship between the parties (that of adult daughter and father) creates no inference of an ability to control." *Megeff v. Doland,* 123 Cal. App. 3d 251, 261 (Ct. App. 1981).  Indeed, it is "[t]he ability to control the [parent], rather than the relationship as such," which forms "the basis for a finding of liability on the part of" the adult child. *Id.* (citation omitted).  Here, there is also no evidence in the record that indicates that Ms. Nelson had legal control over her father, Mr. Bender, to give rise to a special relationship.  In addition, even accepting the facts as presented by Defendants about Mr. Bender's prior diabetic events as true; the records of the 911 calls referenced by Defendants do not reflect Ms. Bender's specific knowledge of those events or the underlying details. *See* [Doc. 97 at ¶ 85; Doc. 98-29; Doc. 98-30].  With respect to the 911

which recorded Ms. Bender, *see* [Doc. 97 at ¶ 50; Doc. 98-19; Doc. 99], it is undisputed that the call was made after the incident in question, *see* [Doc. 97 at ¶ 50], and therefore, cannot be used to support foreseeability as of the time of the collision.  Further, upon review of the recording, there is insufficient evidence to infer that such an event was incapacitating.  *See* [Doc. 98-19 (referring to a reading of a Dexcom monitoring system); Doc. 97 at ¶ 54].  There is no evidence in the record that, prior to the date of the accident, Mr. Bender ever had an incident, incapacitating or otherwise, while driving.  *See generally* [Doc. 97].  And there is insufficient information regarding the diabetic incidents prior to the accident to demonstrate that Ms. Nelson should have reasonably inferred that Mr. Bender could suffer an incapacitating diabetic incident while driving.  *See* [*id.*].  For these reasons and those set forth above, this Court concludes that Ms. Nelson did not have a special relationship with her father to give rise to a duty of care to prevent Mr. Bender from driving.

### 2.       Duty to Prevent Mr. Wesley Nelson from Riding

*Special Relationship.*  Again, there is no evidence in the record that indicates Ms. Nelson had any legal control over Mr. Wesley Nelson, as a legally emancipated adult.  Contrary to Defendants' argument, the record does not support the conclusion that Mr. Wesley Nelson had been discharged from the hospital nine days earlier into his mother's legal control.  Rather, the discharge notes simply indicate that "Pt. left the facility with his mother," not that he was discharged into her legal custody and care.  *See* [Doc. 97-6 at 7; Doc. 107 at ¶ 33]. For the reasons set forth above, this Court concludes that Ms. Nelson did not have a special relationship with Mr. Wesley Nelson to give rise to a duty to prevent him from riding with Mr. Bender.

### 3.      Ms. Nelson's Affirmative Actions

Defendants further contend that even absent a special relationship, Ms. Nelson could be liable for negligence by preventing Mr. Wesley Nelson from driving and encouraging or directing Mr. Bender to transport him.  [Doc. 97 at 29–30].  Defendants further contend that Ms. Nelson could be found liable because she negligently or recklessly directed Mr. Wesley Nelson to intervene.  [*Id.* at 30].  Although not characterized as such, Defendants implicitly argue that Ms. Nelson's affirmative actions constitute misfeasance, i.e., the defendant has created a new risk of harm to the plaintiff.  *See Western Innovations, Inc. v. Sonitrol Corp.*, 187 P. 3d 1155, 1158–59 (Colo. App. 2008); [Doc. 97 at 29–30 ("Again, individuals have some fault when they create or further dangerous situations. . . .  Accordingly, Amy Nelson created or furthered the foreseeably risky situation of Dennis Bender driving Plaintiff despite Dennis Bender's propensity for incapacitating diabetic incidents.").  "In determining whether to recognize a duty in a misfeasance case, courts must consider many factors, including the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden on the actor."  *Smit v. Anderson*, 72 P.3d 369, 373 (Colo. App. 2002).

***Requesting Mr. Bender to Drive Mr. Wesley Nelson.***  In weighing these factors, this Court concludes that the circumstances presented do not give rise to a duty on the part of Ms. Nelson with respect to having her father drive her son.  As discussed above, while Ms. Nelson understood her father's management of his diabetic incidents had declined, there is no evidence in the record that demonstrates that she knew of any prior incapacitating events—particularly while driving.  *See generally* [Doc. 97].  There is also no evidence in the record that Mr. Bender had any moving violations or traffic infractions associated with or arising from his diabetes prior

to the collision.  *See* [*id.*].  There is no evidence that any medical provider or legal authority had ever directed, or even suggested to, Mr. Bender that he should not drive.  There is also no evidence that Ms. Nelson observed her father acting in an unsafe manner on the day of the collision, prior to receiving a call from her son.  *See* [*id.*].  If anything, Ms. Nelson was attempting to guard Mr. Wesley Nelson and the general public from harm by asking her father to transport her son.

***Directing Her Son to Get His Grandfather to Pull Over.***  The Court next considers whether Ms. Nelson was negligent in directing Mr. Wesley Nelson to intervene.  As noted by Defendants, Plaintiff argues that "there is no evidence that Wesley acted on that suggestion." [*Id.* at 30 (citing [Doc. 94 at 15])].  Again, this Court concludes that Ms. Nelson had no duty. Indeed, in weighing the foreseeability and likelihood of injury in directing Mr. Wesley Nelson to "get his grandfather to pullover" against the overall social utility of the instruction, legal authority and common-sense weighs in favor of Ms. Nelson's direction to her son.  And the potential burden of imposing a duty upon Ms. Nelson—a non-passenger reacting to an emergency through a phone call—appears untenable.  Accordingly, this Court respectfully **GRANTS** summary judgment in favor of Plaintiff as to the issue of Defendants' designation of Amy Nelson as a nonparty at fault.

C.      **Cecile Bender**

1.      **Duty to Prevent Dennis Bender from Driving**

Although it is undisputed that Ms. Nelson reported her mother "was the one who was tracking his variable blood sugars and making him eat when his [blood sugar] was low," [Doc. 97 at ¶ 83], this fact does not establish any legal control or custody by Ms. Bender over her husband to justify a special relationship.  Indeed, Defendants point to no authority in which

Colorado courts have found such a duty between spouses. Other courts outside this jurisdiction have declined to find a special relationship between spouses, even one who knows of her spouse's propensity for violence, finding that "[t]he absence of such ability [to control] is fatal to a claim of legal responsibility. . . . Where, as in the instant case, the natural relationship between the parties . . . creates no inference of an ability to control, the actual custodial ability must affirmatively appear." *Megeff*, 123 Cal. App. 3d at 261. For these reasons and those discussed above, this Court concludes that Ms. Bender did not have a special relationship with her husband, and thus, owed no duty to prevent Mr. Bender from driving.

### 2.    Affirmative Actions by Ms. Bender

With respect to Ms. Bender, Defendants offer evidence that (1) she was not wearing her seatbelt at the time of the accident, [Doc. 97 at ¶ 59 (citing [Doc. 97-2 at 9])]; (2) their experts posited that, "more likely than not, one of the occupants of the vehicle made an attempt to stop or regain control of the vehicle by turning the ignition key to the off position," [Doc. 97-1 at 11]; (3) that the crash scene findings were "consistent with [Ms.] Bender being unrestrained and positioned between the front seats as the Toyota translated toward the utility pole," [*id.* at 12]; (4) the airbags and pretensioners did not deploy because the ignition had been turned off, and then turned back on, immediately prior to impact, [*id.* at 11]; (5) an insulin syringe was found on the floor mat of the right front seat during an inspection, [*id.* at 9, 12]; and (6) Plaintiff's medical record states that "GF had a diabetic seizure on the way home from therapy resulting in GM trying ti [sic] give him insulin crashing the car and damaging," [Doc. 97-11 at 16].

While Plaintiff denies that Ms. Bender was attempting to give Mr. Bender insulin, *see* [Doc. 107 at ¶ 56 (citing [Doc. 107-2 at 50:6–18, 51:5–24])], and indicates that he has stipulated that Mr. Bender was negligent, [*id.* at ¶ 55], this Court must view the evidence and draw all

inferences in favor of Defendants as the nonmoving party.  *Phillips*, 2021 WL 4914395, at *1. In addition, the Court must resolve factual ambiguities against the moving party.  *Id.*  In applying this standard, this Court cannot determine, as a matter of law, that Ms. Bender did not have any duty or that the risks of her affirmative actions were not of the type to be within the scope of any such duty.  Thus, this Court finds that summary judgment with respect to any duty and liability on the part of Ms. Bender is precluded.

Accordingly, the Court respectfully **DENIES** Plaintiff's Motion for Partial Summary Judgment, only with respect to Defendants' designation of Cecile Bender as a nonparty at fault limited to her affirmative actions.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)     The Motion for Partial Summary Judgment [Doc. 94] is **GRANTED in part** and **DENIED in part**;

(2)     Summary judgment is **GRANTED** insofar as Plaintiffs seek to strike the designations of Amy Nelson and Bradley Nelson as nonparties at fault, *see* [Doc. 85];

(3)     Summary judgment is **DENIED** insofar as Plaintiffs seek to strike the designation of Cecile Bender as a nonparty at fault with respect to her alleged attempts to inject Dennis Bender with insulin and/or attempts to turn off/on the ignition, *see* [*id.*], and **GRANTED** for all other theories; and

(4)     All pending deadlines in this matter **REMAIN SET**.

DATED:  April 18, 2023                    BY THE COURT:

Nina Y. Wang
United States District Judge