**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 20-cv-03119-NYW-KAS

WESLEY NELSON, by and through his conservator and guardian, Amy Nelson,

    Plaintiff,

v.

TOYOTA MOTOR CORPORATION,

    Defendant.

---

### ORDER ON RULE 702 MOTIONS

---

Pending before the Court are four motions to limit or exclude expert testimony at trial under Federal Rules of Evidence 702 and 703 (the "Motions"):

(1)    Toyota Motor Corporation's Motion to Exclude Plaintiff's Life Care Planner Expert Helen Woodard Under Fed. R. Evid. 702–703 (the "Woodard Motion"), [Doc. 212];

(2)    Toyota Motor Corporation's Motion to Exclude Plaintiff's Biomechanics Expert Paul Lewis Under Fed. R. Evid. 702–703 (the "Lewis Motion"), [Doc. 213];

(3)    Toyota Motor Corporation's Motion to Exclude Plaintiff's Vehicle Electro-Mechanical Systems[] Expert Peter J. Sullivan Under Fed. R. Evid. 702 (the "Sullivan Motion"), [Doc. 214]; and

(4)    Plaintiff's Motion to Exclude Opinions of Defendant's Biomechanical Expert, Dr. Michael Carhart[,] Pursuant to F.R.E. 702 (the "Carhart Motion"), [Doc. 215].

The Court has reviewed the briefing on the Motions, the applicable law, and the docket in this case.  In addition, the Court held a hearing on the Motions on May 16, 2024.  [Doc. 229].   For the reasons discussed below, the Court respectfully **DENIES** the Woodard Motion, **DENIES** the Lewis Motion, **GRANTS in part** and **DENIES in part** the Sullivan Motion, and **DENIES** the Carhart Motion.

## BACKGROUND

The Court has previously discussed the background of this case in detail.  *See, e.g.*, [Doc. 177].  In short, Plaintiff Wesley Nelson ("Plaintiff" or "Mr. Nelson"), a front-seat passenger in a 2017 Toyota RAV4 driven by his grandfather, nonparty Dennis Bender ("Mr. Bender"), suffered severe injuries in an October 25, 2018, motor vehicle accident in Adams County, Colorado, where the subject vehicle swerved off the road and hit a utility pole, rolling over several times.  *See* [*id.* at 1–2].  Mr. Bender survived the crash, but Plaintiff's grandmother Cecile Bender ("Ms. Bender"), who was in the back seat, died at the scene.  *See* [*id.* at 2].  The vehicle's front airbags, side-curtain airbags, and seatbelt pretensioners did not deploy.  *See* [*id.*].

Plaintiff filed this action in October 2020.  [Doc. 1].  The operative Third Amended Complaint states one claim for strict liability against Defendant Toyota Motor Corporation ("Defendant" or "TMC").[1]  [Doc. 80 at 11–12].  Specifically, Plaintiff alleges that "defects in design, manufacture, and inspection made the Subject Vehicle unreasonably dangerous, unfit and unsafe for its intended use and caused the the [sic] failure of the

---

[1] Plaintiff previously named Toyota Motor Sales, U.S.A., Inc. as a second defendant, but the Parties stipulated to that entity's dismissal in January 2024.  [Doc. 210; Doc. 211].

EDR[2] to record a crash event, the failure to deploy the side curtain airbags, and the failure of the pretensioners to perform as an ordinary user would expect when the Subject Vehicle was used in its intended and foreseeable manner."  [*Id.* at ¶ 46 (footnote added)]. At the Final Pretrial/Trial Preparation Conference held on June 27, 2024, Plaintiff clarified that he will proceed at trial solely under a manufacturing defect theory.  *See also* [Doc. 255 at 3 ("As a result of Defendant's defective manufacturing, critical safety systems, including the seatbelt pretensioner and side curtain airbags malfunctioned and failed to deploy, as they were designed to do in a foreseeable rollover event."); Doc. 256 at 4:9–13].[3]  Defendant's position is that the vehicle's safety systems failed to deploy because other occupants shifted the car into "Park" and turned off the ignition to try to prevent the crash.  *See, e.g.*, [Doc. 193 at 2; Doc. 255 at 4].  Defendant also maintains that both Mr. Bender and Ms. Bender contributed to the crash, which should reduce any recovery by Plaintiff.  *See* [Doc. 255 at 4].

The Court has set this matter for a fourteen-day jury trial beginning September 3, 2024.  [Doc. 207 at 1].  On November 15, 2023, the Parties sought leave to file motions under Rule 702 of the Federal Rules of Evidence.  [Doc. 208].  This Court granted the request, [Doc. 209], and the instant Motions followed.  Defendant has filed the Woodard, Lewis, and Sullivan Motions, and opposes the Carhart Motion.  [Doc. 212; Doc. 213; Doc. 214; Doc. 216].  Plaintiff has filed the Carhart Motion, and opposes the Woodard, Lewis,

---

[2] "EDR" refers to event data recorders installed in Toyota vehicles to record the vehicle status at the timing of a crash.  [Doc. 80 at ¶ 22].

[3] When referring to documents filed in this action, this Court uses the convention [Doc. __ at __], referring to the docket and page number assigned by the District of Colorado's CM/ECF system.  When referring to a transcript, this Court refers to the page and line numbers associated with the original transcript.

and Sullivan Motions.  [Doc. 215; Doc. 217; Doc. 218; Doc. 219].  The Parties also filed reply briefs in support of the Motions.  [Doc. 221; Doc. 222; Doc. 223; Doc. 224].  This Court has deemed the Woodard Motion submitted on the papers; permitted oral argument with respect to the Lewis, Sullivan, and Carhart Motions; and received evidence with respect to the Sullivan Motion.  [Doc. 220; Doc. 229].  All Motions are now ripe for decision.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As noted by the Advisory Committee when the Rule was first promulgated, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702 advisory committee's note.

It is well established that trial courts are charged with the responsibility of acting as gatekeepers to ensure that expert testimony or evidence admitted is not only relevant, but also reliable.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–52 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–89 (1993).  To fulfill that gatekeeper function, courts within the United States Court of Appeals for the Tenth Circuit

("Tenth Circuit") conduct a two-part inquiry.  First, courts consider whether the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline by assessing the expert's qualifications and the admissibility of the proffered evidence, i.e., whether the reasoning or methodology underlying the testimony is valid. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2005)).  Second, courts look at whether the proposed testimony is sufficiently relevant to the issues presented to the factfinder.  *See id*.  The party offering the expert opinion bears the burden of establishing its admissibility, including all foundational requirements, by a preponderance of the evidence.  *United States v. Nacchio*, 555 F.3d 1234, 1251 (10th Cir. 2009) (en banc); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).  To that end, courts consider the following non-exhaustive factors in analyzing whether a particular expert opinion meets the requirements of Rule 702, *Daubert*, and their progeny:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Id.*  The analysis is opinion-centric, rather than expert-centric.  *See United States v. Nacchio*, 608 F. Supp. 2d 1237, 1250–51 (D. Colo. 2009).

Additionally, although an expert witness's testimony must assist the jury to be deemed admissible, Fed. R. Evid. 702(a), it may not usurp the jury's fact-finding function,

*see Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988).  Nevertheless, "a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Id.* at 809.  Such testimony "is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function." *Id.* at 809–10.  If "the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based," however, "the testimony cannot be allowed." *Id.* at 810.  Testimony that "articulates the ultimate principles of law governing the deliberations of the jury" is inadmissible. *Id.* at 808.  Additionally, although the line between what is helpful to the jury and what intrudes on the jury's role as the finder of fact is not always clear, it is settled that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).

Finally, Rule 703 "authorizes an expert to testify to an opinion even if that opinion is based on otherwise inadmissible facts or data, which at times may include out-of-court testimonial statements." *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012). In full, Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

## ANALYSIS

### I.    Woodard Motion

The Woodard Motion arises from Defendant's concern that Plaintiff's life care planner expert, Laura Woodard ("Ms. Woodard"),[4] "will attempt to act as an insulated conduit for the undisclosed hearsay opinions and statements of Plaintiff's treating physicians and other expert witnesses."  [Doc. 212 at 9].  Defendant seeks to exclude such testimony under Rules 802, 703, and 403.  [*Id.*].  Plaintiff responds that the testimony is admissible because "[t]he role of a life care planner is to review reports, records and opinions of other experts and treating physicians and condense that information into a comprehensive plan."  [Doc. 217 at 4].  Plaintiff cites *Cereceres v. Walgreen Co.*, in which this Court held that "[w]hile a vocational expert . . . may be unqualified to offer medical opinions, she is qualified to offer opinions within her experience that are *based* on factual predicates provided by medical experts."  645 F. Supp. 3d 1110, 1122 (D. Colo. 2022).

As in *Cereceres*, this Court finds that the testimony contemplated by the Woodard Motion is generally permissible at trial.  "Experts may rely on the reports or information of other experts," and "[l]ife care planners especially utilize this practice to review records and opinions of medical experts, treating physicians, and specialists to determine pertinent expenses for the jury."  *Rivera v. Volvo Cars of N.A., LLC*, No. 13-cv-00397-KJG-KBM, 2015 WL 11120666, at *3 (D.N.M. June 22, 2015); *see also Cunningham v.*

---

[4] The Woodard Motion states that it is directed at Helen Woodard.  [Doc. 212 at 1]. However, *Laura Woodard* was disclosed and deposed in discovery.  [Doc. 212-4 at 31; Doc. 212-5].  Opposing the Woodard Motion, Plaintiff stresses that he "retained Laura Woodard to complete Plaintiff's life care plan," and "Helen Woodard took no part in Laura's evaluation."  [Doc. 217 at 1 n.1]; *see also* [Doc. 217-3 at 2].  Defendant does not address this matter in its Reply, *see generally* [Doc. 223], but agreed at the hearing that the Woodard Motion is directed at Laura Woodard.

*Harmon*, No. 15-cv-00159-ABJ-KHR, 2017 WL 2129731, at *3 (D. Wyo. Feb. 17, 2017) ("[L]ife care opinions based on an underlying doctor's evaluation are permissible."); Fed. R. Evid. 703.  Ms. Woodard may not attempt to diagnose Plaintiff or introduce medical opinions for their truth in the first instance, and to the extent that she attempts to do so, Defendant may renew its objection.  But in her role as a life care planner whose qualifications are undisputed, she may apply reliable and accepted methodologies to others' medical opinions consistent with the Federal Rules of Evidence.  To the extent the underlying "facts or data would otherwise be inadmissible," the Court finds that their probative value outweighs their prejudicial effect for purposes of Rule 703.

Finally, TMC's concern that it cannot "substantively explor[e] [Ms. Woodard's] opinions or cross-examin[e] her," [Doc. 212 at 5], is overstated.  The methodology underlying Ms. Woodard's opinions with respect to cost of care and Plaintiff's outlook presents "a matter of credibility and weight to be brought out in cross-examination and resolved by the jury."  *North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1120 (D. Utah 2007).  Ms. Woodard's opinions as a qualified life care planner are both relevant and reliable to the assessment of Plaintiff's damages, if any.  The Court is not persuaded by Defendant's arguments to the contrary.  The Woodard Motion is respectfully **DENIED**.

## II.    Lewis Motion

Biomechanics is "the science concerned with the action of forces, internal and external, on the living body."  *Finn v. BNSF Ry. Co.*, No. 11-cv-00349-ABJ-KHR, 2013 WL 462057, at *2 (D. Wyo. Feb. 6, 2013).  In the Lewis Motion, Defendant targets testimony by Plaintiff's biomechanics expert, Paul Lewis ("Mr. Lewis"), (1) that Ms. Bender was physically incapable of turning off the subject vehicle's ignition or shifting it into park

during the crash sequence, (2) that there was insufficient room for the average person of Ms. Bender's age to fit between the vehicle's front seats, and (3) that curtain shield airbags properly deploying would have minimized Plaintiff's injury.  TMC argues that the expert opinions with respect to Ms. Bender's ability to turn the car off and put it into park are impermissibly speculative because they are based on generalizations with respect to older people, not Ms. Bender's actual measurements or surrogate testing[5]; further, TMC contends that Mr. Lewis's opinion with respect to Ms. Bender's inability to fit between the car seats fails to account for her ability to turn her body.  [Doc. 213 at 7–10].  Finally, Defendant contends that the airbag opinions are speculative and conclusory.  [*Id.* at 11–12].  Plaintiff responds that Mr. Lewis's airbag opinions are grounded in the scientific literature, as well as "his own detailed inspection of the subject vehicle, review of the accident reconstruction[,] and multiple validated studies."  [Doc. 218 at 5–7].  As to Ms. Bender's movements, Plaintiff asserts that Mr. Lewis relied upon her "well-documented physical frailty," and that sufficient facts support his opinion that she could not move from the backseat to turn off the car or move it into park.  [*Id.* at 7–11].

Starting with Mr. Lewis's opinion that Ms. Bender could not relocate during the crash sequence and approach the center console by fitting between the front seats, the Court finds that Defendant's objections largely go to the weight of the evidence.  What matters for Rule 702 is whether the expert witness has applied a reliable methodology to the facts in a way that can assist the finder of fact.  *See Cook*, 580 F. Supp. 2d at 1082. Although Defendant effectively questions how much weight should be afforded to Mr.

---

[5] Surrogate studies are "one of the tools employed by biomechanical engineers to understand the interaction between a person and a product."  *Lyons v. Leatt Corp.*, 322 F.R.D. 327, 334 (N.D. Ind. 2017).

Lewis's opinions for various reasons, the Court respectfully concludes that the underlying opinions may come in under *Daubert* because Defendant's concerns do not undermine the basic validity of the methodology employed by Mr. Lewis or the relevance of his opinions to the disputed issues in this case. *Cf. Martensen v. Koch*, No. 13-cv-02411-REB-CBS, 2015 WL 514913, at *2 (D. Colo. Feb. 6, 2015) ("Rule 702 is properly construed as a rule of inclusion rather than one of exclusion, and the rejection of expert testimony is the exception rather than the rule." (quotation omitted)).

Defendant contends that Mr. Lewis "has not conducted any analysis or study to prove that Mrs. Bender would not have been physically capable of repositioning herself," [Doc. 213 at 8], but it disregards the multiple inputs Mr. Lewis analyzed in forming his mobility opinion. These include Ms. Bender's use of an assistive device for walking, her medical history, her daughter's description of her difficulty walking, and the nature of the crash sequence. *See, e.g.*, [Doc. 213-3 at 7 (concluding that "Mrs. Bender was not an athletic able-bodied person with the physicality to jump to action")]. It does not appear that Defendant challenges Mr. Lewis's qualifications as an expert in biomechanics. *See generally* [Doc. 213]; *see also* [Doc. 213-5 at 20–21]. And as courts in this District have noted, "[b]iomechanical experts have extensive knowledge about how human bodies move when forces are applied to them and thus may provide testimony as to how vehicle occupants move and are impacted in vehicular accidents." *Gould v. Union Pac. R.R. Co.*, No. 19-cv-02326-PAB-NRN, 2021 WL 4428286, at *4 (D. Colo. Sept. 27, 2021) (quotation omitted). So too here, as Mr. Lewis may offer opinions that "relate to whether the biomechanics support the claim" that Ms. Bender could have intervened during the crash sequence. *Id.* (quotation omitted); *cf. also Adamscheck v. Am. Fam. Mut. Ins. Co.*, 818

F.3d 576, 589 (10th Cir. 2016) (finding no harmless error in exclusion of biomechanics expert who "would have provided testimony based on his expertise and training as a biomechanical engineer, explaining why [the] facts supported his opinion that the injuries . . . could not have been caused by the accident").

TMC's concerns about Mr. Lewis's opinion with respect to Ms. Bender's ability to fit between the vehicle's front seats likewise go to weight and not admissibility.  Mr. Lewis estimated Ms. Bender's measurements and opined that a person with those approximated measurements could not have fit between the front seats.  *See* [Doc. 213-3 at 7].  The fact that these were estimated measurements that did not account for potential body rotation certainly undermines the weight a factfinder may afford to the opinion if those aspects of the analysis come out on cross-examination, but the basic conclusion that the average person of Ms. Bender's height and weight could not fit between the front seats while facing forward appears methodologically sound, undisputed, relevant, and within the scope of Mr. Lewis's biomechanics expertise.  *See Mills v. FCA US, LLC*, No. 18-cv-01891-MSK-STV, 2021 WL 4079363, at *11 (D. Colo. Sept. 7, 2021) ("The mere fact that the opponent can point out flaws in the witness' reasoning or quirks in the underlying data does not, of itself, warrant exclusion of the opinions under Rule 702."); *see also Dodge*, 328 F.3d at 1222 ("[A]bsolute certainty is not required." (quotation omitted)).

Finally, the Court is mindful of the fact that Defendant seeks to introduce similar, albeit countervailing, testimony from its rival biomechanics expert, Dr. Carhart.  Plaintiff has moved to exclude Dr. Carhart's opinions, making similar arguments to those in the Lewis Motion.  *Compare* [Doc. 213], *with* [Doc. 215].  Under these circumstances, the

Court finds it prudent to permit both evidentiary presentations to the extent they are reliable and relevant.  *See Lexington Ins. Co. v. Newbern Fabricating, Inc.*, No. 14-cv-00610-CVE-TLW, 2017 WL 11685176, at *3 (N.D. Okla. Feb. 2, 2017) (noting that "the opinions of dueling experts" can "assist the trier of fact in fully understanding an issue" (quotation omitted)).

Turning to the side-curtain airbags, Mr. Lewis opines in his report that, "[h]ad the side curtain airbag deployed, it would have served as a cushioned barrier between [Mr. Nelson's] head and the ground, and would [have] significantly decreased linear and angular forces acting on his head/brain."  [Doc. 213-5 at 17].  Seeking to exclude this opinion, Defendant relies upon *Mills v. FCA US, LLC*.  In *Mills*, the trial court excluded as unscientific two dueling expert opinions with respect to the ability of airbags to reduce injury in a car accident.  The court reasoned (1) that "[t]he opinion that a side-curtain airbag would not have lessened Ms. Mills' injury risk [was] based on nothing more than an observation that the structures that Ms. Mills' other experts alleged caused her injuries would not have been covered by an inflated airbag," 2021 WL 4079363 at *16; and (2) that the rival opinion "that a side-curtain airbag ordinarily would protect the driver in a side-impact collision" was not based on "analyz[ing] the coverage area of the side-curtain airbag relative to the direction that Ms. Mills traveled during the impact or the direction in which the roof system was deforming during the crash, analyses that would be essential to formulate an opinion that the side-curtain airbag would have indeed deployed at a location that would have cushioned the impact."  *Id.* at *19.

Here, Plaintiff has shown that Mr. Lewis adequately connected the deployment of the airbags in question to the mitigation of Plaintiff's injury during the crash sequence.

First, Mr. Lewis relied on review of technical materials and vehicle testing—albeit testing he did not himself perform, and which did not employ a surrogate, both of which go to the weight of the evidence—to determine that the coverage area of the side-curtain airbags encompassed the site of Mr. Nelson's ejection from the vehicle. *See* [Doc. 213-5 at 16]; *see also* [*id.* at 17 ("The Toyota was equipped with a side curtain airbag at [Mr. Nelson's] position that should have deployed.")]. Next, Mr. Lewis's opinion with respect to side-curtain airbags reducing injury was based on the scientific literature, including prior studies by automotive companies, as informed by his biomechanics expertise. *See, e.g.*, [*id.* at 18]. Unlike in *Mills*, this Court finds that Mr. Lewis has applied his expertise to the scientific literature and technical materials in a manner that renders his opinions with respect to the deployment of airbags admissible under *Daubert*. The Lewis Motion is respectfully **DENIED**.

## III.   Sullivan Motion

The Parties seem to agree that, during the accident, a power interruption affected the Airbag Control Module ("ACM"), causing the nondeployment of the airbags during the crash sequence. *See* [Doc. 214 at 3; Doc. 219 at 2]. The Parties disagree, however, about whether this power event was induced by the vehicle's occupants (Defendant's position) or by a manufacturing defect in the vehicle itself (Plaintiff's position). *Compare* [Doc. 214 at 3–4], *with* [Doc. 219 at 2–3]. In the Sullivan Motion, TMC seeks to exclude Peter J. Sullivan's ("Mr. Sullivan") "speculative intermittent power loss defect theory . . . because Sullivan admits that he cannot specifically identify what caused the Vehicle's power loss and where it came from to explain why the Vehicle's airbags did not deploy." [Doc. 214 at 8].

At the outset, the Court finds that all argument with respect to the exclusion of opinions related to diagnostic recorders is mooted by the Court granting Defendant's motion in limine with respect to the exclusion of diagnostic-recorder evidence at trial. [Doc. 250]. In addition, Defendant has not questioned Mr. Sullivan's ability to testify as to his opinion that the ACM failure was not attributable to occupant interference, or as to the various inputs he uncovered in the course of his investigation, such as the trip counts and diagnostic codes. *Cf. Taylor v. Cooper Tire & Rubber Co.*, 130 F.3d 1395, 1398 (10th Cir. 1997) ("It is clear that in many states circumstantial evidence, whether expert or not, may support a manufacturing defect claim."); *Weir v. Fed. Ins. Co.*, 811 F.2d 1387, 1392 (10th Cir. 1987) ("The inference of a defect is permissible whenever the plaintiff has introduced evidence that would exclude other causes of the accident."). Instead, this Rule 702 dispute concerns Mr. Sullivan's opinion that the subject vehicle was suffering random power losses leading up to the crash sequence attributable to a manufacturing defect, *see, e.g.*, [Doc. 214-9 at 46], and that one such power loss prevented the airbags from activating upon impact during the instant crash, [*id.* at 49].

As Plaintiff explains, Mr. Sullivan has ruled out Defendant's theory of operator error and endorsed the theory of a manufacturing defect. *See, e.g.*, [Doc. 219 at 8; Doc. 214-9]. Defendant contends that Mr. Sullivan's opinions are unreliable because he "admits that he cannot specifically identify what caused the Vehicle's power loss and where it came from to explain why the Vehicle's airbags did not deploy." [Doc. 214 at 8]. Even assuming that Mr. Sullivan reliably ruled out the occupant-induced power interruption hypothesis and that he is qualified to render his opinion about a power interruption arising

from a manufacturing defect,[6] the Court respectfully concludes that an "impermissible analytical gap," *Bitler*, 400 F.3d at 1233, requires the exclusion under Rule 702 of Mr. Sullivan's opinion that the power interruption affecting the ACM was caused by a manufacturing defect.  On the record before it, including but not limited to the evidence and testimony presented at the hearing on the Motions, this Court concludes that the expert opinion in question amounts to inadmissible *ipse dixit* that lacks an adequate causal foundation.

The Tenth Circuit has referred to Mr. Sullivan's general methodology in this case as "a process of reasoning to the best inference."  *See id.* at 1237; *see also id.* at 1237 n.1 ("[I]nference[s] to the best explanation—or 'abductive inferences'—are drawn about a particular proposition or event by a process of eliminating all other possible conclusions to arrive at the most likely one, the one that best explains the available data.").  Under *Bitler*, reasoning to the best inference "requires a process of eliminating possible causes as improbable until the most likely one is identified."  *Id.* at 1237.  Critically, "more than mere possibility, an inference to the best explanation for the cause of an accident must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable."  *Id.* at 1238 (emphasis added).

Here, Mr. Sullivan purports to have ruled out Defendant's occupant-interference hypothesis, *see, e.g.*, [Doc. 214-5 at 36; Doc. 214-9 at 31], and has inferred from an increase in vehicle trip counts and the presence of certain diagnostic codes, among other factors, that an electrical defect interfered with the proper functioning of the electrical

---

[6] TMC challenges Mr. Sullivan's qualifications in its Reply Brief, but the issue is not presented in the Sullivan Motion and may thus be deemed waived.  *Compare* [Doc. 224 at 4–5], *with* [Doc. 214].

system and caused the ACM to fail during the crash sequence, [Doc. 214-9 at 32; Doc. 214-7 at 74:23–24].  However, Mr. Sullivan testified at the hearing on the Sullivan Motion that he did not know what the actual defective condition was, and he further conceded that he never inspected the car's electrical system, including its microchips, wiring, and circuit board.  [Hearing Tr. at 19:18–20:10].[7]  Specifically, Mr. Sullivan testified:

> Mr. Kern:  My question isn't about that.  My question is straightforward.  Did you ever find the reason why there was an interruption to the ACM power?  You never found that, did you, sir?
>
> Mr. Sullivan:  For the reasons I stated, that's correct, we did not go to micro analysis levels, it could have been—this is important.  It could have been outside of the box, outside of the air bag control module itself the actual defect, and it could have been basically erased by the subject crash, because if the power circuit was destroyed in the subject crash we would not be able to do any analysis on the power circuit that went to the air bag control module post crash.

[*Id.* at 19:17–20:4].  Mr. Sullivan further stated in response to questioning by TMC that he never found the "root cause" of the problem, asserting only that it was "power disruption to the ACM or a problem within the ACM that was a power interruption."  [*Id.* at 24:2–9].

Even if he has adequately ruled out occupant interference, the Court finds that Mr. Sullivan does not reliably support his intermittent electrical defect hypothesis.  As the Tenth Circuit recently emphasized in upholding a district court's exclusion of Mr. Sullivan, *Bitler* "requires more for this approach than merely eliminating one of the two hypotheses postulated by the expert."  *Roe v. FCA US LLC*, 42 F.4th 1175, 1183 (10th Cir. 2022).

---

[7] The Court cites to a preliminary nonpublic version of the May 16, 2024, evidentiary hearing transcript.  Accordingly, there may be some variations with respect to page numbers, line numbers, or specific language should an official transcript be ordered and prepared.

Instead, *Bitler* demands "independent evidence that the cause identified is of the type that could have been the cause." *Id.* (quoting *Bitler*, 400 F.3d at 1237). Here, Mr. Sulivan's opinion that the vehicle was experiencing intermittent power outages is certainly within the realm of possibility. But Mr. Sullivan has failed to render this opinion "highly probable," *Bitler*, 400 F.3d at 1238, because it is nonspecific and speculative. Mr. Sullivan neither knows nor theorizes the specific nature of the purported electrical defect. As Defendant observes, his opinions leave the cause, location, and mechanics of the defect unclear. *See* [Doc. 214 at 14].[8] Indeed, Mr. Sullivan concedes that he has not examined the subject vehicle's electrical systems. Mr. Sullivan's opinion is thus "unreliable because he never attempted to identify the manufacturing defect that he postulates to have existed." *Hauck v. Michelin N.A., Inc.*, 343 F. Supp. 2d 976, 985 (D. Colo. 2004).

Mr. Sullivan chiefly relies on indicators—increased trip counts, various diagnostic codes, and so forth—that seem to work backward to support the proposition that a power loss defect could have been present. None of these indicators affirmatively demonstrates the application of a reliable and accepted methodology to determine the presence of a specified defective condition in the subject vehicle. *Cf. In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1234 (D. Colo. 1998) ("Nor can an expert witness' self-serving assertion that his conclusions were derived by a scientific method be deemed conclusive."). Even

---

[8] Plaintiff asserts in his response that "Mr. Sullivan has identified a verifiable, articulable defect in the subject RAV4: the Supplemental Restraint System failed to deploy active restraints during the subject rollover event because 'the subject ACM failed to perform safety critical functions of detecting, recording, and responding to an experienced scenario for which it was designed, marketed, and installed.'" [Doc. 219 at 6 (quoting [Doc. 214-9 at 36])]. Of course, that merely begs the question. As Defendant observes, "Sullivan states the result of the Accident scenario—i.e., that the airbag failed to deploy because of power loss—but that is not the 'defect.'" [Doc. 224 at 7 (emphasis omitted)].

if they did, *Bitler* requires the remaining cause to be "highly probable," so it is significant that Plaintiff's position is only that these indicators are "consistent with" a non-specified electrical defect.  *See, e.g.*, [Doc. 219 at 9].  As discussed at the hearing, the increased trip count could be explained by increased trips due to changes in the Benders' driving routine leading up to the accident.  Mr. Sullivan has also recognized "so many things" that could cause the B1000 error code which he relies upon.  *See* [Doc. 214-7 at 81:13–18].  And the U0151 code likewise appears susceptible to multiple causes.  *See* [Doc. 224-2 at 4].  But even if these factors, separately or in combination, provide some support for the possibility of an intermittent power defect, the Court finds that the relationship is not "highly probable" under *Bitler* such that Mr. Sullivan's causation opinion may be admitted under *Daubert*.

Respectfully, it appears that Mr. Sullivan has made a guess.  Even if it is a reasoned guess, or indeed his best guess, such conjecture hardly amounts to a highly probable cause of the power failure in question that is supported by independent evidence and can meet *Daubert*'s standard for admitting expert testimony.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  The opinion in question does not seem reliable from the perspective of the four nonexclusive factors guiding reliability determinations under *Daubert*—testing, peer review, error rate or methodological standards, and acceptance in the scientific community, *see Dodge*, 328 F.3d at 1222—nor, indeed, from any other such consideration.  Under these circumstances, this Court concludes that "an impermissible analytical gap exists between [the] premises and conclusion" of Mr.

Sullivan, which renders his challenged opinion inadmissible under Rule 702.  *Bitler*, 400 F.3d at 1233; *see also Hauck*, 343 F. Supp. 2d at 986 ("If an expert opines as to causation in a product liability case based on a process of elimination approach, he or she needs to be an expert as to the remaining theory using a reliable methodology justifying it as the sole cause.").  In short, Plaintiff has failed to carry his burden of demonstrating that Mr. Sullivan has reliably reached the opinion at issue.

As Defendant puts it, Mr. Sullivan "must isolate a testable, verifiable, articulable defect and tell this Court what specifically 'failed' with reliable, scientific principles."  [Doc. 214 at 4].  He has not done so.  The Sullivan Motion is respectfully **DENIED in part as moot** to the extent it seeks to exclude opinions with respect to diagnostic recorders, and **GRANTED in part** to the extent it seeks to prohibit Mr. Sullivan from testifying about his intermittent power loss opinion.

## IV.   Carhart Motion

The Carhart Motion concerns anticipated testimony by Defendant's biomechanics expert Dr. Michael Carhart ("Dr. Carhart") (1) that Ms. Bender moved between the front seats to intervene during Mr. Bender's medical crisis and was then ejected through the front passenger window; (2) that Ms. Bender and Plaintiff could each have used the park lever and ignition; (3) that Ms. Bender strained Plaintiff's seatbelt in a way that increased his potential for injury; and (4) that the side-curtain airbags would *not* have prevented Plaintiff's injuries.  [Doc. 215 at 3].  The Carhart Motion largely presents the inverse of the Lewis Motion, as Plaintiff attacks Defendant's expert's rival perspective on how "human factors," [*id.*], could have caused the crash or contributed to his injury.

Like Mr. Lewis, Dr. Carhart is a biomechanics expert, and his qualifications are unchallenged.  *See* [Doc. 216 at 4].  In the Carhart Motion, Plaintiff characterizes Dr. Carhart's opinions with respect to the crash sequence as improperly speculative and therefore inadmissible.  *See, e.g.*, [Doc. 222 at 3].  But the better way to characterize the admissible scope of Dr. Carhart's conclusions is that—like Mr. Lewis's opinions—they do not speculate as to what actually happened during the crash sequence, as an accident-reconstruction expert might, but rather apply biomechanics expertise to the facts of the case to assess what *could have happened* during the crash sequence.  *See, e.g.*, [*id.* at 6 (referencing "Dr. Carhart's opinions concerning Mrs. Bender's 'possible' occupant kinematics and 'possibility of attempted intervention'")]; *see also Gould*, 2021 WL 4428286, at *4 (biomechanics experts may offer opinions that "relate to whether the biomechanics support the claim" (quotation omitted)).  As Defendant explains, Dr. Carhart employed "established biomechanical techniques, scientific principles, and peer-reviewed data . . . to evaluate the likely dynamics given the specific circumstances of the incident and the generally applicable laws of motion."  [Doc. 216 at 7].  Like Mr. Lewis, Dr. Carhart may properly advise the jury as to the application of his understanding of biomechanics to the crash sequence based on the facts as he knows them, or as they are assumed to be for the purposes of his testimony.  And unlike with Mr. Sullivan, the "possibility" of the rival opinion testimony by Dr. Carhart and Mr. Lewis with respect to Ms. Bender's movements during the crash sequence becomes its virtue.

For example, consider Plaintiff's concern with Dr. Carhart's opinion that Ms. Bender's "unrestrained kinematics during the rollover sequence would have contributed to the loading, excursion, and injury potential experienced by the restrained Mr. Wesley

Nelson during the rollover portion of this crash."  [Doc. 215-1 at 15 (emphasis added)]. Plaintiff argues that "[b]ecause there is no evidence that Mrs. Bender added more load to Plaintiff's seatbelt, nor are there any studies to validate such a phenomenon, Dr. Carhart's opinion that Mrs. Bender contributed to Plaintiff's loading and injury potential is speculative and unreliable."  [Doc. 215 at 12–13].   And Plaintiff notes that another of Defendant's experts found no physical signs of strain on the seatbelt.  *See* [*id.* at 12]. However, the Court takes the proper scope of Dr. Carhart's opinion for purposes of Rule 702 as focusing on the biomechanics of the crash sequence with respect to the *possibility* of a scenario where Ms. Bender was unbelted in the backseat, leaning forward between the front seats, and then ejected through the front windshield.  In Defendant's words "[i]f Dr. Carhart's opinion that Mrs. Bender exited the front passenger window is assumed to be true, then these corollary other interactions are natural consequences/occurrences." [Doc. 216 at 9].   Both Plaintiff and Defendant may present properly supported expert testimony with respect to what was possible during the crash sequence from a biomechanics perspective.  Here, that includes Dr. Carhart's opinions about Ms. Bender's potential movements during the crash sequence.

Further echoing the Lewis Motion, Plaintiff seeks to exclude Dr. Carhart's opinion as to the efficacy of side-curtain airbags—specifically, that "[t]he relevant biomechanical, rollover, and curtain literature does not support an assertion that curtain airbag deployment would have eliminated Mr. Nelson's risk for injury during the subject crash." [Doc. 216-4 at 20].  Plaintiff asserts that this opinion is largely based on outdated literature and inapplicable field studies.  [Doc. 215 at 14–15].  Defendant responds that Dr. Carhart properly relied on studies with respect to crash severity reducing airbag effectiveness to

inform his opinions about how the crash conditions involving the subject vehicle would have affected the airbags, had they deployed.  *See* [Doc. 216 at 10–13].  Upon review, Dr. Carhart's report indeed sets out the literature and certain case studies to support his opinions on this topic.  *See, e.g.*, [Doc. 215-1 at 16–18].  And while these sources may have shortcomings that undermine the value of the resulting opinion in the context of this case, any such shortcomings go to weight and not admissibility.  The Court thus concludes that, just as Plaintiff's expert may reliably opine that airbags would have reduced the injury at issue, Defendant's expert may reliably opine as to the opposite.  It is up to the Parties to flesh out the strengths and weaknesses of these competing expert opinions through examination of the relevant witnesses; and, ultimately, it is up to the jury to decide whom to believe.  *See Lexington Ins. Co.*, 2017 WL 11685176, at *3.  The Carhart Motion is respectfully **DENIED**.

## CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1)     Toyota Motor Corporation's Motion to Exclude Plaintiff's Life Care Planner Expert Helen Woodard Under Fed. R. Evid. 702–703 [Doc. 212] is **DENIED**;

(2)     Toyota Motor Corporation's Motion to Exclude Plaintiff's Biomechanics Expert Paul Lewis Under Fed. R. Evid. 702–703 [Doc. 213] is **DENIED**;

(3)     Toyota Motor Corporation's Motion to Exclude Plaintiff's Vehicle Electro-Mechanical Systems[] Expert Peter J. Sullivan Under Fed. R. Evid. 702 [Doc. 214] is **GRANTED in part** and **DENIED in part as moot**; and

(4)     Plaintiff's Motion to Exclude Opinions of Defendant's Biomechanical Expert, Dr. Michael Carhart[,] Pursuant to F.R.E. 702 [Doc. 215] is **DENIED**.

DATED:  July 11, 2024                        BY THE COURT:

                                             _____
                                             Nina Y. Wang
                                             United States District Judge